UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC. d/b/a CAREFIRST BLUE CROSS BLUE SHIELD, a Maryland Corporation,<br><br>Plaintiff,<br><br>v.<br><br>FIRST CARE, P.C., et al<br><br>Defendants. | 04MBD 10217<br>MBD No. _____<br><br>C.A. No. 2:04CV191<br>(Pending in E.D. Va. (Norfolk)) |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO THIRD-PARTY SUBPOENA

Pursuant to Fed. R. Civ. P. 45, defendants First Care, P.C. *et al* (collectively, "First Care") respectfully submit this memorandum in support of its Motion to Compel Production of Documents Responsive to Third-Party Subpoena, wherein First Care seeks an Order compelling non-party Thomson & Thomson to produce the eight (8) trademark search reports that it is withholding (at the instruction of CareFirst's counsel) on the basis of the attorney work product doctrine.

### INTRODUCTION

This is a trademark action in which plaintiff CareFirst of Maryland d/b/a CareFirst BlueCross BlueShield ("CareFirst") alleges that First Care, a medical practice comprised of nine family physicians in the Chesapeake/Portsmouth area of Virginia, is infringing CareFirst's trademark rights and diluting the source-identifying quality of its trademark.

First Care has raised a number of compelling defenses, including the fact that – while the two companies have co-existed for ten years – CareFirst is unable to identify a single "consumer" who has been confused. In addition, First Care claims that – because of the extensive third party use of the marks CAREFIRST and FIRST CARE[1] – CareFirst's trademark rights are, at best, weak and cannot possibly be famous under the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c).

Through written discovery, First Care has requested a copy of all trademark searches conducted by or on behalf of CareFirst relating to the marks CAREFIRST or FIRST CARE. On July 6, 2004 (after repeated requests), CareFirst's counsel advised First Care's counsel as follows:

> I have determined that any responsive search reports, *and I believe there is one*, would be protected from discovery by the work-product doctrine and shall be listed on our Privileged Document Log.[2]

After more than eight written and oral requests for CareFirst's privilege log, and numerous promises by CareFirst's counsel to produce the log,[3] First Care's counsel determined that it would attempt to secure the documents from another source. Accordingly, First Care issued a subpoena to Thomson & Thomson, requesting a copy of all search reports performed for CareFirst relating to CAREFIRST or FIRST CARE.

---

[1] A Dun & Bradstreet search performed by First Care revealed *hundreds* of companies using the marks CAREFIRST, FIRST CARE, or variants thereof, and a search performed on Westlaw's corporate database generated *over a hundred* companies using the name/mark CAREFIRST and/or FIRST CARE.

[2] *See* Exh. 2 to accompanying motion to compel (true and accurate copy of July 6, 2004 letter from Christopher Collins). All exhibits referenced in this memorandum are appended to the companion motion.

[3] During a telephone conference held on August 2, 2004, CareFirst's counsel assured First Care's counsel that the log would finally be produced the following day (August 3).

2

Thomson & Thomson advised First Care that it had located nine (9) responsive trademark search reports in its archives – a far cry from the *one report* CareFirst's counsel identified. However, Thomson & Thomson stated that it had been instructed by CareFirst's counsel to withhold eight (8) of the reports on the basis of the attorney work product doctrine.[4] More specifically, Thomson & Thomson was advised by CareFirst's counsel that the documents

> relate to [CareFirst's] enforcement efforts regarding the CAREFIRST mark and name, and that disclosure of these documents would reveal an attorney's decision not only to conduct a particular search in which both the timing and content of the search request would likely reveal the attorney's thought process but also, when coupled with publicly available information, could also reveal the attorney's subsequent advice to the client and the client's enforcement strategy.[5]

First Care filed this motion promptly after receiving Thomson & Thomson's letter.

As demonstrated below, the search reports were not "prepared in anticipation of litigation or trial," as Rule 26(b)(3) requires, and thus they are not protected by the work product doctrine. In fact, Thomson & Thomson in its letter does not even attempt to argue that the documents were prepared in anticipation of litigation or trial. Moreover, even if the search reports are protected (which they are not), the Court should still compel their production because First Care has made a showing that it "has substantial need of the materials in the preparation of [its] case and that [it] is unable without undue hardship to obtain the substantial equivalent of the materials by other means. *See* Fed. R. Civ. P. 26(b)(3).

---

[4] *See* Exh. 3 (true and accurate copy of August 2, 2004 letter from John Ala).
[5] *See* Exh. 3.

## ARGUMENT

1. **The Search Reports At Issue Are Not Work Product Because They Were Not Prepared In Anticipation of Litigation or Trial**

The burden of establishing that the search reports are entitled to protection under the work product doctrine rests with non-party Thomson & Thomson, the party resisting production. *See In re Lernout & Hauspie Securities Litigation*, 222 F.R.D. 29, 2004 U.S. Dist. LEXIS 9948 *25 (D. Mass. May 27, 2004) (Collings, M.J.) (further citation omitted). Thomson & Thomson has not met its burden, nor can it.

To be protected, CareFirst's search reports must have been "prepared in anticipation of litigation or for trial." *See id.* (quoting Fed. R. Civ. P. 26(b)(3)). Thomson & Thomson has not even alleged that the search reports were prepared in anticipation of litigation or for trial,[6] and thus First Care's motion should be granted on that basis alone.

Even if the Court infers from Thomson & Thomson's silence a claim that the search reports were prepared in anticipation, that claim wilts under scrutiny. The work product doctrine was designed to prevent "unwarranted inquiries into the files and mental impressions of an attorney," *Hickman v. Taylor*, 329 U.S. 495, 510 (1947), and recognizes that it is "essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." *Id. at 510-11*. The work product doctrine has limited application and scope, however. As Magistrate Judge Collings recently explained, the key inquiry is whether "the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *See In re Lernout*, 2004 U.S. Dist. LEXIS 9948 *25. In *Maine v. U.S. DOI*, 298 F.3d 60 (1st Cir. 2003), the First Circuit adopted the Second Circuit's test, i.e., whether "in light of the

---

[6] *See* Exh. 3.

nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." The search reports at issue cannot be said to meet this rigorous standard.

Applying this standard, CareFirst's search reports cannot fairly be characterized as having been prepared in anticipation of litigation or trial. Nor do they reveal the mental impressions or opinions of CareFirst's attorneys. To the contrary, the search reports show one thing and one thing only: that in 1995, 1996, 1997, 1998, 2000, 2003, and 2004 CareFirst received information concerning the identity of dozens – if not hundreds – of third parties who were using the marks CAREFIRST, FIRST CARE, or variants thereof. The search reports do not disclose any advice offered by CareFirst's counsel, and they do not reflect any litigation strategy (because they were not prepared in connection with any pending or threatened action).[7]

As with all such reports, the search reports at issue were generated by a Thomson & Thomson analyst whose job was to scour databases looking for references identical to, or potentially similar to, the marks CAREFIRST and FIRST CARE. The fact that CareFirst (or its counsel) conducted trademark searches for CAREFIRST and FIRST CARE is in no way confidential or proprietary, and the search results would have been the same for any company making a similar request to Thomson & Thomson (and paying the requisite fee). Thomson & Thomson does not work exclusively for CareFirst or its counsel. In fact, it is well known that Thomson & Thomson holds a dominant position in the market for trademark searches, and First Care's counsel has utilized Thomson & Thomson's services on many occasions.

---

[7] CareFirst's purported concern about potentially revealing its "enforcement strategy" or legal advice is belied by the fact that CareFirst has already produced in this litigation numerous cease and desist letters served by CareFirst's counsel on alleged infringers. These letters – much more than trademark search reports – suggest what legal advice CareFirst's counsel gave the company and give some insight into CareFirst's "enforcement strategy."

If accepted, Thomson & Thomson's claim (as proxy for CareFirst) that production of the search reports would "reveal the attorney's thought process [and] also . . . could reveal the attorney's subsequent advice to the client"[8] would stretch the work product doctrine beyond recognition. First Care is not seeking counsel's interpretation of the search reports, or an investigator's report on a particular company's use (or non-use of the marks in question), or minutes from strategy sessions. To the contrary, First Care is seeking nothing but basic factual data, i.e., the results of a vendor's searches of various databases. CareFirst's putative concerns (raised through Thomson & Thomson) are unfounded and, to say the least, strained. As the Eighth Circuit aptly noted, the purpose of the work product doctrine is not violated "by allowing discovery of documents that incorporate a lawyer's thoughts in, at best, such an indirect and diluted manner." *See Simon v. G.D. Searle & Co.*, 816 F.2d 397, 402 (8th Cir. 1987).

Contrary to CareFirst's contention (through Thomson & Thomson), First Care has no interest in deciphering CareFirst's "enforcement strategy" – even if such information could be gleaned from the search reports – because *First Care has already been sued*. As the Fourth Circuit has observed, "[t]he immunity for [non-opinion work product] is little more than an "anti-freeloader" rule designed to prohibit one adverse party from riding to court on the enterprise of the other." *See National Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 n.5 (4th Cir. 1992). First Care has no interest in "freeloading"; it merely seeks access to critical evidence that is in the exclusive possession of its adversary.

In the context of trademark law, the Trademark Trial and Appeal Board – the administrative body charged with adjudicating disputes over trademark registrability – has repeatedly acknowledged that, while the *comments* of an attorney relating to a search report are

---

[8] *See* Exh. 3.

protected, "a trademark search report is not privileged." *See, e.g., Amerace Corp. v. USM Corp.*, 183 U.S.P.Q. (BNA) 506 (TTAB 1974); *Fisons Ltd. v. Capability Brown Ltd.*, 209 U.S.P.Q. (BNA) 167, 170 (TTAB 1980); *Miles Labs., Inc. v. Instrumentation Lab., Inc.*, 185 U.S.P.Q. (BNA) 432, 434 (TTAB 1975) ("It has been held that search reports, *per se*, do not fall within the attorney-client privilege and must be furnished. However, any comments or opinions provided by opposer's attorney in relation thereto are privileged and need not be supplied."[9] This Court should make a similar pronouncement.

In light of the foregoing, the Court should reject the argument that CareFirst's trademark search reports are protected by the work product doctrine. Consequently, the Court should compel Thomson & Thomson to produce the eight (8) reports it is withholding at CareFirst's direction.

---

[9] CareFirst is well aware of the TTAB's view on search reports, as the Board ordered CareFirst to produce all of its search reports (from 1996 to the date of the order) in an unpublished decision issued on July 2, 2001. *See* Exh. 4. In that Order, the Board stated that "[s]earch reports are discoverable, but the comments or opinions of attorneys relating thereto are privileged and not discoverable (unless the privilege is waived)." Inexplicably, CareFirst brazenly continued to withhold most of its search reports, claiming that the Board "did not overrule [its] objections based on attorney-client privilege or attorney work product" and claiming in later proceedings that its production of "availability searches" but not "investigative searches" was consistent with the Board's Order. In an unpublished decision issued on July 1, 2002, the Board determined that "Applicant had not provided a showing of necessity to overcome [CareFirst's] objection" and finding that there was insufficient information before it to conclude that the attorney work product immunity had been waived. *See* Exh. 5. These decisions are not published and, thus, are not citable as precedent of the TTAB.

2. **Even if the Search Reports Are Protected by the Work Product Doctrine, the Court Should Still Compel Their Production**

   A. **Evidence of Third Party Use Is Undeniably Relevant to First Care's Defenses to Dilution Claim**

Even if the search reports are found to be protectible work product (which they are not), the Court should still compel their production.[10] Pursuant to Rule 26(b)(3), a party "may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial . . . upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." There can be little dispute that First Care meets this standard, as the search reports at issue are essential to several of First Care's defenses, and the information cannot be obtained from any other source.

For example, in order to qualify for protection under the Federal Trademark Dilution Act ("FTDA"), 15 U.S.C. § 1125(c), CareFirst must establish that its mark (CAREFIRST) was both famous and distinctive *as of the date of First Care's first use* of the mark FIRST CARE – which occurred in late 1994 or early 1995. *See* 15 U.S.C. § 1125(c)(1). The statute provides that one of the factors a court should consider in determining whether a mark is famous and distinctive is "the nature and extent of use of the same or similar marks by third parties." *Id.* at § 1125(c)(1)(G); *see also Washington Speakers Bureau, Inc. v. Leading Authorities, Inc.*, 33 F.

---

[10] Many courts distinguish between so-called "opinion" work product, "which includes 'materials that contain the mental impressions, conclusions, opinions, or legal theories of an attorney,'" and so-called "ordinary" work product, "which includes everything else that is eligible for protection as work product. . . ." Most courts accord greater protection to opinion work product. *See In re Grand Jury Subpoena*, 220 F.R.D. 130, 2004 U.S. Dist. LEXIS 4108 **44-48 (D. Mass. Mar. 16, 2004) (Young, C.J.) (further citation omitted). The search reports at issue cannot, under any interpretation, reasonably be characterized as opinion work product.

Supp. 2d 488, 504 (E.D. Va. 1999) (third party use of similar marks suggests that mark is not sufficiently famous to merit protection under FTDA), *aff'd per curiam*, 2000 U.S. App. LEXIS 14669 (4th Cir. 2000); *Star Markets, Ltd. v. Texaco, Inc.*, 950 F. Supp. 1030, 1036 (D. Haw. 1996) (finding mark STAR MARKETS not famous in part because of extensive third party use of words "star" and "markets").

Thus, the language of the statute itself confirms that evidence of third party use of the marks CAREFIRST and FIRST CARE *as of 1995* is central to First Care's defense against CareFirst's dilution claim, as third party use of those marks in 1995 undermines CareFirst's ability to prove that its mark was famous and distinctive *as of First Care's date of first use*. There is simply no way to recreate this essential information today.

The 1995 search report(s) will show third party use in 1995; the 1996 reports will show third party use in 1996; the 1997 reports will show third party use in 1997, and so on. They show third party use in the past, and these search report results cannot possibly be recreated by running search reports at the present time. As such, CareFirst's search reports constitute a unique "snapshot" in time. They are crucial to First Care's defenses, and the same information cannot be obtained from another source. Accordingly, the Court should compel CareFirst to produce the search reports. *See National Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc.*, 967 F.2d 980, 984 n.5 (4th Cir. 1992) (noting that "work product immunity never reaches to protect from discovery actual evidence taken from the scene or facts about the scene or incident"); *see also State Farm v. Perrigan*, 102 F.R.D. 235, 237-38 (W.D. Va. 1984) (citing approvingly *McDougall v. Dunn*, 468 F.2d 468 (4th Cir. 1972) (plaintiff in an accident case given access to copies of witness statements obtained by insurance adjuster in part "because he suffered brain injuries and related amnesia from the accident which inhibited him from

reconstructing the events and reaching the truth"); *Reedy v. Lull Engineering Co., Inc.*, 137 F.R.D. 405, 1991 U.S. Dist. LEXIS 8277 *8 (M.D. Fla. June 17, 1991) (where issue of terrain conditions at time of accident was relevant to case, it "would be inequitable to permit [plaintiffs] to deny access of [photographs taken at time of accident] to the defendant" on basis of work product doctrine).

**B.    Third Party Use Is Undeniably Relevant to First Care's Defenses to Infringement Claim**

Similarly, evidence of third party use is highly relevant to First Care's defenses to CareFirst's infringement claim. Third party use is a factor in determining a trademark's distinctiveness and strength (one of the enumerated factors considered in assessing a likelihood of confusion). *See, e.g., Time, Inc. v. Petersen Publishing Co. LLC*, 173 F.3d 113, 118 (2d Cir. 1999) ("the use of part or all of the mark by third parties weakens its overall strength"); *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998) (third party use of words "street" and "wise" served to weaken strength of mark STREETWISE).

Presently, evidence of extensive third party use of the marks CAREFIRST and FIRST CARE is readily available to First Care. For example, one can visit firstcare.com to see the website of a very large Texas HMO that appears to have been operating under the name/mark FIRST CARE since the mid-1980s. Moreover, First Care located over 100 companies presently operating under the names CareFirst or First Care (or variants thereof) by searching corporation databases in the fifty states, and First Care detailed these third-party uses in its first set of requests for admission. However, as explained above, First Care does not have access to evidence of third party use of the marks CAREFIRST and FIRST CARE *in the past*.

As set forth above, CareFirst's search reports constitute a unique source of information concerning third party use of the marks at issue between 1995 and the present. They are

snapshots in time that cannot be recreated today. Accordingly, the Court should compel Thomson & Thomson to produce the eight search reports it is withholding at CareFirst's direction.

### C. Evidence of CareFirst's Awareness of Third Party Use Is Undeniably Relevant to First Care's Defense of Laches

The search reports at issue are also undeniably relevant because they will almost certainly support First Care's defense of laches. Under Fourth Circuit law (which will govern the applicability of the defense of laches at summary judgment and/or trial), "[c]ourts may apply the doctrine of estoppel by laches to deny relief to a plaintiff who, *though having knowledge of an infringement*, has, to the detriment of the defendant, unreasonably delayed in seeking redress." *See What-a-Burger of Virginia, Inc. v. Whataburger, Inc. of Corpus Christi, Texas*, 357 F.3d 441, 448-49 (4th Cir. 2004) (emphasis in original) (further citation omitted). The Court's analysis should encompass at least these three questions:

1. **Whether the owner of the mark knew of the infringing use;**
2. Whether the owner's delay in challenging the infringement was inexcusable or reasonable; and
3. Whether the infringer user was unduly prejudiced by the owner's delay. *Id.* (observing that "unreasonable delay" begins at time trademark owner "knows or should know she has a provable claim for infringement") (emphasis added).

Indeed, because the Lanham Act does not include a limitations period, "courts use the doctrine of laches to address the inequities created by a trademark owner who, despite having a colorable infringement claim, allows a competitor to develop its product around the mark and expand its business, only then to lower the litigation boom." *Id.* (quoting *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 824 (7th Cir. 1999).

It is difficult to imagine more compelling and unique evidence of what CareFirst knew and when it knew it (vis-à-vis First Care's existence and use of its mark) than trademark search

11

BOS1405167.1

reports ordered by CareFirst (for the marks CAREFIRST and FIRST CARE) between 1995 and 2004 (when it filed suit against First Care). Indeed, the one Thomson & Thomson search report produced by CareFirst in this litigation, which is dated November 2000, confirms that CareFirst knew or should have known about First Care as of November 2000, as First Care's name and the addresses of its various locations appear several times in that report.

There is simply no other way for First Care to obtain comparable information concerning what CareFirst knew and when it knew it – the first prong in the Fourth Circuit's three-prong laches analysis. First Care is entitled to use this information to support its laches defense and to question CareFirst's witnesses about the basis for its delay in filing suit. As such, the Court should compel Thomson & Thomson to produce the search reports at issue. Any other result would unfairly deny First Care access to unique evidence that is essential to a key defense.

### D.     Evidence of CareFirst's Awareness of First Care Is Undeniably Relevant for Impeachment

In response to an interrogatory, CareFirst stated under oath that it first "became aware of Defendants and their use of the mark FIRST CARE during an administrative agency proceeding before the Trademark Trial and Appeal Board . . . in which Carefirst is opposing the registration of the mark FIRSTCAROLINACARE. . . ." More specifically, CareFirst stated that it first became aware of First Care on September 10, 2001, when opposing counsel in the TTAB proceeding filed an affidavit from Ms. Linda Simpson, office manager of First Care, P.C. *See* Exh. 6.

The veracity of this sworn statement is undermined by the November 2000 Thomson & Thomson search report produced by CareFirst during this action, as it contains several references to First Care. First Care is entitled to ascertain whether the veracity of this sworn statement is further undermined by the Thomson & Thomson search reports from 1995, 1996, 1997, and

BOS1405167.1

12

1998. There is no equivalent way to challenge the veracity of this statement. Accordingly, the Court should compel Thomson & Thomson to produce the eight search reports it is withholding at the direction of CareFirst.

### 4. CareFirst Waived Any Work Product Protection By Voluntarily Producing a November 2000 Thomson & Thomson Search Report

In the course of its document production, CareFirst produced one Thomson & Thomson trademark search report (dated November 3, 2000).[11] The report spans 416 pages and reflects a comprehensive trademark search performed for the mark FIRSTCARE.

It is difficult to understand (and CareFirst has not yet attempted to explain) the distinction between this search report (which it produced) and the eight other search reports in Thomson & Thomson's possession (which it has instructed Thomson & Thomson not to produce). Indeed, it is difficult to understand why the production of this search report does not reveal CareFirst's "enforcement strategy" or its counsel's "subsequent advice" any less than the eight reports it continues to withhold. In light of this, the Court should interpret CareFirst's production of this search report as a waiver of any work product protection that arguably could attach to the eight reports being withheld. Accordingly, the Court should compel Thomson & Thomson to produce the remaining eight search reports.

---

[11] This is the same search report that CareFirst has authorized Thomson & Thomson to produce.

## CONCLUSION AND REQUEST FOR RELIEF

For the reasons set forth herein, First Care respectfully requests that the Court issue an Order compelling Thomson & Thomson to produce the eight responsive trademark searches in its possession. In light of the undeniably material nature of the documents sought through this motion and the baseless nature of the objections asserted, First Care also requests that the Court order CareFirst to compensate First Care for the attorneys' fees and costs incurred in the preparation and prosecution of this motion and supporting memorandum of law.

Respectfully Submitted,

DEFENDANTS

By their attorneys

Jason C. Kravitz, BBO No. 565904
Kristin Dulong Kuperstein, BBO No. 641710
NIXON PEABODY LLP
100 Summer Street
Boston, Massachusetts 02110
Tel: 617-345-1000
Fax: 617-345-1300

Dated: August 3, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2004, I caused a copy of the within document to be served by first class mail on the following:

Andrew G. Howell, Esq.
Williams Mullen PC
222 Central Park Avenue
Suite 1700
Virginia Beach, VA 23462-3035

Christopher M. Collins
Stevens Davis
1615 L Street, N.W.
Washington, DC 20036

John V. Ala
Corporate Counsel
Thomson & Thomson
500 Victory Road
North Quincy, MA 02171

Jason C. Kravitz

BOS1405167.1