UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CAREFIRST OF MARYLAND, INC. d/b/a CAREFIRST BLUECROSS BLUESHIELD, a Maryland Corporation,<br><br>    Plaintiff,<br><br>v.<br><br>FIRST CARE, P.C., et al.<br><br>    Defendants. | MBD No. 04-10217<br>(Pending in E.D. Va.<br>Norfolk) Civ. Action<br>No. 2:04CV191 |

## OPPOSITION TO DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS RESPONSIVE TO THIRD-PARTY SUBPOENA

As intervenor, Plaintiff Carefirst of Maryland, Inc. d/b/a/ Carefirst BlueCross BlueShield ("Carefirst") hereby opposes Defendant's Motion to Compel Production of Documents Responsive to Third-Party Subpoena.

### FACTUAL BACKGROUND

Carefirst of Maryland, Inc. d/b/a Carefirst BlueCross BlueShield, through its predecessors, commenced use of its CAREFIRST mark and name over 27 years ago in association with its health care organization. Carefirst relies on its incontestable federal service mark, trademark, and collective membership mark registrations covering the mark CAREFIRST[1] in seeking injunctive relief and other damages against the defendant, First Care, P.C. and its managing agents and owners, Faith E. Dajao, Fred C. Crum, and Mansukhlal Ramolia (defendants are collectively referred to as "First Care") in a civil action before the District Court for the Eastern District of Virginia.

---

[1] U.S. Registration Nos. 1,546,326 and 1,543,100. True and correct copies of the certificates of registration are attached as Exhibit A.

First Care decided to use the mirror image of Carefirst's mark in late 1994 or early 1995, more than five years after the issuance of Carefirst's registrations, in association with First Care's medical practice in Portsmouth, and later Chesapeake, Virginia. Carefirst initiated this action in March of 2004 seeking redress for First Care's infringement, unfair competition, and dilution of its CAREFIRST mark and name. Upon First Care's request, Carefirst granted a one month extension of time for First Care to respond to the Complaint. First Care answered the Complaint asserting defenses including laches and acquiescence.

Carefirst has already produced well over 10,000 pages of documents responsive to First Care's multiple sets of discovery requests. As part of its requests for the production of documents, First Care sought all trademark search reports relating to the name and/or marks CARE FIRST or FIRST CARE. While Carefirst produced several hundred pages of non-privileged search reports used for "clearance/availability" opinions, Carefirst asserted and continues to rely on the work product doctrine to protect those search reports requested by Carefirst's attorney, prepared by Carefirst's agent, Thomson & Thomson, and reviewed by Carefirst's attorney in anticipation of litigation as part of Carefirst's ongoing enforcement efforts to protect the strength, distinctiveness, and fame of the CAREFIRST mark.

In an attempt to do indirectly what it could not properly do directly, First Care subpoenaed Carefirst's agent, non-party Thomson & Thomson. The subpoena required production of all search reports requested by either counsel for Carefirst or its predecessors, Carefirst, Carefirst's predecessors, or Carefirst's sister companies, from 1990 to the present relating to the name and/or marks CAREFIRST, CARE FIRST,

FIRSTCARE, and/or FIRST CARE or any variants thereof. Thomson & Thomson informed First Care that it had identified nine responsive search reports[2] and that eight of the reports would be withheld based on Carefirst's assertion of the attorney work product doctrine. First Care filed the instant motion after receiving Thomson & Thomson's objections to the subpoena.

ARGUMENT

I.    **The Search Reports at Issue are Protected by the Attorney Work Product Doctrine Because They Were Prepared in Anticipation of Litigation.**

A.    **The Purpose of Trademark Searches**

An attorney requests that a trademark search be performed for one of two reasons. The search is either (1) requested in order to enable an attorney to provide a "clearance/availability" opinion as to whether or not his client can proceed with the use or registration of a mark without the risk of encroaching on someone else's prior rights or (2) requested in order to enable an attorney to become aware of potential users and infringers of his client's existing mark. The most comprehensive and cost effective way for an attorney to police a mark on behalf of his client is through a search report prepared by either an attorney or an attorney's agent. In this manner, an attorney becomes aware of live and dead trademark applications and registrations recorded in the U.S. Patent and Trademark Office and in various secretary of state offices. A comprehensive trademark search will also include alleged common law usages such as business name listings and

---

[2] Two of the nine identified "search reports" are actually watch notices sent to Carefirst's counsel at his request as part of a "watch package." Watching services provide timely notification of newly filed and/or newly published trademarks. For the purposes of this memorandum, the search reports and the watch notices identified in Thomson & Thomson's objection letter of August 2, 2004 will collectively be referred to as "search reports."

- 3 -

domain names.[3]  A prudent attorney analyzes the references in the search report in order to determine which references to further investigate for actual use and the extent of use. After further research and investigation, an attorney then communicates his or her advice to the client with respect to which uses of confusingly similar marks the client should stop via infringement actions.

### B.    Carefirst Produced Non-Privileged Reports But Refuses to Waive the Protection of the Work Produce Doctrine.

While Carefirst has produced all search reports relating to any "clearance/availability" opinions,[4] the remaining search reports identified in response to First Care's subpoena are protected by the attorney work product doctrine.  Rule 26(b)(3) of the Federal Rules of Civil Procedure codifies the attorney work product doctrine set forth in *Hickman v. Taylor*.[5]  As set forth in the rule, the work product doctrine encompasses (1) documents and other tangible things (2) which were prepared in anticipation of litigation or trial (3) by or for a party or by or for that party's representative.[6]  In this case, the search reports at issue are documents, so the first element is not in dispute.

---

[3] The term "alleged" is important to note since common law portions of search reports potentially reveal names that may or may not be currently in use or otherwise used in a non-trademark manner, e.g., only as trade names.  This will be discussed further in Section II (A) of this opposition brief.

[4] First Care's reliance on Trademark Trial and Appeal Board cases is misplaced.  Carefirst does not dispute that search reports conducted in an effort to provide advice about whether a mark is available for use and registration are not protected by the work product doctrine.  These search reports are not performed in anticipation of litigation, but rather, are conducted in order to determine whether a particular mark has already been registered and/or is possibly being used by another party.  Significantly, the Board did not overrule Carefirst's attorney work product doctrine objection in the July 1, 2002 unpublished order attached to First Care's motion as Exhibit 5.  If the Board was of the opinion that the attorney work product doctrine objection did not exist with regard to "investigative" search reports or that it did not apply in that particular case, it would have stated so and overruled Carefirst's objection.  Instead, the Board accepted Carefirst's attorney work product objection and stated that the Applicant had not made a showing of necessity to overcome it.

[5] 329 U.S. 496 (1947).

[6] Fed R. Civ. P. 26(b)(3).

BOS_456873_1/WROSEBUSH

In *U.S. v. Nobles*, the Supreme Court clarified that the doctrine protects material prepared by agents for the attorney as well as those prepared by the attorney himself.[7] The search reports were prepared by Thomson & Thomson, a third party provider of intellectual property research services. Thomson & Thomson performed the searches at the direction of counsel for Carefirst.[8] Thomson & Thomson conducted the search as an agent of counsel for Carefirst and at his request and using his dictated search criterion, therefore, the third element of the rule is satisfied. First Care's argument that Thomson & Thomson may have generated similar results to a company making a similar request to Carefirst is totally irrelevant. The fact remains that Thomson & Thomson is ultimately Carefirst's agent through Carefirst's attorney.

With regard to the second element, the search reports were requested and performed in "anticipation of litigation" as part of Carefirst's counsel's investigation of potential trademark infringers. The First Circuit adopted the Second Circuit's (and five other courts of appeals') formulation of the work-product rule in *State of Maine v. U.S. DOI*.[9] The court determined that documents should be considered to be within the scope of Rule 26(b)(3) if, "in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation."[10] The First Circuit agreed with the Second Circuit that this broader interpretation of the rule was necessary to include documents which,

---

[7] 422 U.S. 225, 238-39 (1975).
[8] *See* Declaration of Barth X. deRosa, Esquire, trademark counsel for Carefirst attached as Exhibit B. Affidavits from attorneys confirming that documents protected by the work product doctrine were in fact prepared at the attorney's direction in anticipation of litigation help a party meet its burden under Rule 26(b)(3). *See Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 918 F. Supp. 491 (D.N.H. 1996).
[9] 298 F.3d 60, 68 (1st Cir. 2002).
[10] *See id.* (quoting *U.S. v. Adlman*, 134 F.3d 1194, 1202 (2nd Cir. 1998).

although prepared because of expected litigation, are intended to inform a business decision influenced by the prospects of litigation.[11]

In this case, Carefirst owns incontestable federal registrations for its CAREFIRST mark. The two registrations on which Carefirst relies in the action against First Care issued in 1989. Accordingly, Carefirst's primary reason to request searches for the marks "CARE FIRST or FIRST CARE"[12] in the year 1995 (the date of the earliest search report sought) through the present would be for enforcement purposes and in anticipation of bringing infringement actions against infringers of the CAREFIRST mark.

The contents of a search report provide counsel with one of the most effective means of planning an enforcement strategy and determining which potential infringers to investigate. Courts have found that search reports, requested and conducted in anticipation of litigation are protectable under the work product doctrine. For example, the plaintiffs in *Golden Trade, S.r.L. v. Jordache* protected from discovery a prior art search conducted on plaintiffs' behalf on the basis that it constituted work product because the search was conducted in anticipation of litigation.[13] The defendants in *Golden Trade* argued that they only sought factual material, an identification of the patents embodied in the prior art search, and did not seek any analysis by the searchers or by the plaintiffs' attorney.[14] The court found the defendants' argument unconvincing and

---

[11] *See id.*

[12] Carefirst makes the distinction here between searches for only "FIRSTCARE" and searches for "CARE FIRST or FIRST CARE" and "CAREFIRST." Carefirst has produced and is producing simultaneously with the filing of this memorandum, the searches identified in Thomson & Thomson's objection letter for "FIRSTCARE." These two search reports are "clearance/availability" reports. The other search reports all include Carefirst's mark "CAREFIRST" making it obvious that these reports were requested in order to seek out infringers of "CAREFIRST" or its mirror image, "FIRSTCARE."

[13] 143 F.R.D. 508, 509 (S.D.N.Y. 1992).

[14] *See id.* at 511.

BOS_456873_1/WROSEBUSH

held that the search was made to aid in current and anticipated litigation.[15] Therefore, the results of the search were characterized as "fruits" which "come squarely within the ambit of the work-product doctrine."[16] The court also stated that the disclosure of the items found in the prior art search would allow the defendants to appropriate the research labors, and, to a degree, the analysis of the attorney's agent since the searcher had to make decision as to which patents to review and which to include in his report.[17]

The defendants in *Sawgrass Systems, Inc. v. Basf Aktiengesellschaft* also sought to protect prior art searches conducted in anticipation of litigation under the work product doctrine.[18] The plaintiff argued that the information concerning prior art is, by its very nature, publicly available, and thus not subject to the work-product doctrine.[19] The court found that this argument failed because Sawgrass ultimately sought not the publicly available information, but the product of the defendant's attorneys' labor.[20] The court reasoned that if the information is publicly available, then the plaintiff should have no problem obtaining the information through its own prior art search.[21] In addition, the court likened the prior art search to an attorney's selection and compilation of documents in anticipation of litigation, which is protected by the work product doctrine.[22]

Similarly, Carefirst's attorney instructed Thomson & Thomson to conduct a search based on attorney-selected criteria. Carefirst's counsel directed Thomson & Thomson not only with regard to which terms to search, but also explained how broad or narrow to circumscribe the search in terms of fields/industries. Thomson & Thomson, as

---

[15] *See id.*
[16] *Id.*
[17] *See id.*
[18] 50 USPQ2d 1687 (E.D. Mich. 1999).
[19] *See id.* at 1690.
[20] *See id.*
[21] *See id.*
[22] *See id.*

BOS_456873_1/WROSEBUSH

Carefirst's agent, conducted a search of various records and information based on a particular methodology. The results of the search embodied in the search reports were then analyzed and investigated by Carefirst's counsel in an effort to develop an enforcement strategy in anticipation of bringing law suits against particular infringers on behalf of Carefirst. The disclosure of the search reports coupled with information which is publicly available, e.g., court records divulging which defendants Carefirst has sued, and documents already produced to First Care, such as cease and desist letters, would reveal Carefirst's attorney's thought processes with regard to Carefirst's enforcement strategies. In addition, if First Care is attempting to mount a defense based on alleged third party use of marks confusingly similar to CAREFIRST, then it should be required to do its own research and not ride on the coattails of Carefirst's attorney's work product.

To compel Thomson & Thomson to produce the searches at issue would undermine the purpose of the attorney work product doctrine. Therefore, the Court should quash First Care's subpoena based on a finding that the search reports at issue are protected by the work product doctrine.

II. **First Care has Not Shown a Substantial Need To Overcome the Attorney Work Product Privilege.**

A. **It is Well Established that Search Reports are Not Evidence of Third Party Use.**

In its motion, First Care argues that if the search reports are determined to be protectable work product, then pursuant to Rule 26(b)(3), First Care has a substantial need to obtain the search reports. First Care claims that the search reports are crucial to several of First Care's defenses and that the information cannot be obtained from any other source. First Care fills several pages of its memorandum with argument contending

BOS_456873_1/WROSEBUSH

that the search reports are needed because they are evidence of third party use and that this third party use undercuts Carefirst's dilution claim and its infringement claims.

First Care's argument fails miserably. Well-established precedent holds that search reports are not evidence of the use of any of the marks contained therein. Search reports contain lists of names or terms registered or applied for in U.S. Patent and Trademark Office, business names, and domain names. Thomson & Thomson searches through various databases and lists "hits" which are responsive to the search criteria initially established. These search reports often include references to entities which have long abandoned the use of their business name and/or registration or never used it at all even though they may have filed incorporation documents with the secretary of state.

In *Copy Cop, Inc. v. Task Printing, Inc.*, this Court acknowledged that third party registrations of similar trademarks are material in determining the strength of a mark, "only to the extent that the similar marks are promoted by their owners or recognized by the consuming public."[23] This Court pointed out that the defendant did not allege that any similar mark (any other "cop" logo) was promoted in the relevant area (Boston), or that consumers in Boston area were familiar with any other cop logo other than the plaintiff's.[24]

While Carefirst does not dispute that evidence of third party usage of similar marks on similar goods is admissible and relevant to show the relative strength of a mark,[25] search reports are simply hearsay and not evidence of use.[26] In *International*

---

[23] 908 F. Supp. 37, 47 (D. Mass. 1995) (*quoting McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1171 (7th Cir. 1986).
[24] *See id.*
[25] *See Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626-27 (8th Cir. 1987).
[26] *See AMF v. American Leisure Products, Inc.*, 474 F.2d 1403 (CCPA 1973); *Lloyd's Food Products, Inc. v. Eli's, Inc.*, 987 F.2d 766 (Fed. Cir. 1993); *Weyerhaeuser Co. v. Katz*, 24 USPQ2d 1230 (TTAB 1992); *Tiffany & Co. v. Classic Motor Carriages, Inc.*, 10 USPQ2d 1835 (TTAB 1989); *Fort Howard Paper Co.*,

BOS_456873_1/WROSEBUSH

*House of Pancakes, Inc. v. Elca, Corp.*, the Trademark Trial and Appeal Board pronounced,

> Trademark search reports, in general, and computer printouts of company names provided by mercantile information services, in particular, are hearsay in nature, and the appearance therein of "COLONIAL HOUSE OF PANCAKES" in North Dartmouth, New Hampshire is manifestly incompetent to establish that a business is actually being conducted at that location under that name...[27]

Insofar as the anti-dilution provisions of the Lanham Act provide that one of the factors to be considered in determining whether a mark is famous and distinctive is "the nature and extent of use of the same or similar marks by third parties,"[28] and the likelihood of confusion analyses adopted by the various circuit courts include the number and nature of similar marks in use on similar goods as a factor to be considered,[29] Carefirst does not dispute that third party use is relevant.  However, the search reports sought by First Care's subpoena do not support such use, and are therefore not necessary as required by Rule 26(b)(3).

First Care cannot shirk its burden to show (1) that a particular mark is presently in use, (2) the extent of the mark's use, and (3) that consumer's recognize the mark as is required by the relevant case law in order to prove a successful "weakness" defense. Therefore, First Care has not shown that it has a "substantial need" of the search reports at issue in this proceeding.

---

*v. Kimberly-Clark Corp.*, 221 USPQ 732 (TTAB 1984); *National Football League v. Jasper Alliance Corp.*, 16 USPQ2d 1990 (TTAB 1990); *Red Carpet Corp. of America v. Johnstown American Enter., Inc.*, 7 USPQ2d 1404 (TTAB 1988); and *Electro Corp. v. Electro Sensors, Inc.*, 196 USPQ 315 (TTAB 1977).
[27] 216 USPQ 521, 525 (TTAB 1982).
[28] 15 USC § 1125 (c).
[29] *See, e.g., In re E.I. Du Pont de Nemours & Co.*, 476 F.2d 1357 (CCPA 1973); *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22 (1st Cir. 1989); *Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492 (2nd Cir. 1961).

BOS_456873_1/WROSEBUSH

**B.    Laches Cannot Arise Until the Trademark Owner is Aware of An Infringing Use, Therefore, Disclosure of the Search Reports Will Not Prove or Help Prove First Care's Defense of Laches.**

The subject search reports do not evidence infringing use of Carefirst's mark and cannot support First Care's laches defense.  First Care claims that it requires the search reports dating back to 1995 in order to be able to establish the first prong of the laches inquiry, namely, "whether the owner of the mark knew of the infringing use."  First Care fails to make the required distinction that is crucial to this case, one that distinguishes when Carefirst became aware that an entity by the name of First Care <u>may</u> be operating in the Portsmouth, Virginia area and when Carefirst became aware of the actual use of the FIRST CARE mark which raises the possibility that First Care might be infringing Carefirst's rights.

Simultaneously with the filing of this memorandum, Carefirst is producing Thomson & Thomson "State and Common Law Search" No. 19021611-52 for the mark FIRSTCARE, performed pursuant to a request received on January 10, 1996.  This search report suggests that an entity by the name of FIRST CARE <u>may have been</u> providing health care related services to individuals in the Portsmouth area in January of 1996.  In contrast, Carefirst did not become aware of the "claimed" and alleged use of the FIRST CARE name as a trademark until it received, on September 14, 2001, an affidavit of Ms. Linda Simpson, the office manager of First Care, P.C., attesting to the use of FIRST CARE as a trademark.[30]  Carefirst did not have any evidence that the mark FIRST CARE was actually being used as a trademark and that this use was in fact infringing on

---

[30] This affidavit was served on Carefirst in an unrelated proceeding before the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office.

BOS_456873_1/WROSEBUSH

Carefirst's CAREFIRST mark and name until Carefirst's attorneys investigated First Care and its use of FIRST CARE as a trademark and cross-examined Dr. Marc G. Mertz of First on January 6, 2004.

As the Fourth Circuit stated in *What-A-Burger of Virginia, Inc. v. Whataburger, Inc. of Corpus Christi, Texas*, the third inquiry of the laches analysis asks "whether the infringing user was unduly prejudiced by the owner's delay" in bringing the action.[31] The court further explained that, "[l]ogic dictates that 'unreasonable delay' does not include any period of time before the owner is able to pursue a claim for infringement – otherwise, a trademark owner could be punished for not bringing a claim he had no right to bring."[32] Therefore, "regardless of when the trademark owner initially discovers the use of a similar mark, action against the infringing user is not necessary until, in light of the circumstances, the 'right to protection ha[s] clearly ripened.'"[33] Carefirst, as the prior federal registrant, could not bring an action against First Care until Carefirst could show that a likelihood of confusion "loomed large."[34] "The owner's mere knowledge that he might have an infringement claim at some future date is not sufficient to trigger the period of unreasonable delay required for estoppel by laches."[35] Therefore, the production of the search reports at issue will not reveal anything that would prove any element or otherwise aid First Care in its laches defense. Accordingly, First Care, once again, fails to show a "substantial need" of the search reports in order to overcome the work product privilege.

---

[31] 357 F.3d 441, 448-49 (4th Cir. 2004)(quoting *Brittingham v. Jenkins*, 914 F.2d 447, 456 (4th Cir. 1990).
[32] *Id.* at 449.
[33] *Id.* (quoting *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996).
[34] *See id.* at 451.
[35] *Id.* at 450.

BOS_456873_1/WROSEBUSH

     **C.**     **Carefirst Has Been Consistent in Its Discovery Responses Regarding Its Awareness of First Care's <u>Use</u>, Therefore there is Nothing to Impeach.**

As explained above, there is a fine but very important judicially recognized distinction between the possibility that an entity may have incorporated under a particular name compared with knowledge that an entity is actually using a confusingly similar name as a trademark. The former may amount to inadmissible hearsay while the latter constitutes a potential infringement of the senior user's rights. When Carefirst responded to First Care's Interrogatory No. 18, it stated that it "became aware of Defendants and their use of the mark FIRST CARE during an administrative agency proceeding before the Trademark Trial and Appeal Board of the U.S. Patent and Trademark Office."[36] Carefirst then further described the circumstances surrounding its awareness of "Defendants and their use of the mark." To aid First Care's understanding of this "use" issue, Carefirst supplemented its interrogatory response to identify a document which raised the possibility that an entity in Virginia may have incorporated in January of 1996. This does not alter Carefirst's prior answer concerning knowledge of First Care's infringing use of the mark and name FIRST CARE. Consequently, it is apparent that Carefirst did not misrepresent any facts. First Care's allegation of a "misrepresentation" is revealed as either a ploy to gain access to privileged documents or a lack of understanding of the "use" issue. In either case, First Care's arguments are unavailing and its subpoena should be quashed.

---

[36] *See* First Care's Exhibit 6 of its Motion to Compel.

BOS_456873_1/WROSEBUSH

**III.    Carefirst Did Not Waive Its Work Product Objections by Producing a November 2000 Thomson & Thomson Search Report.**

In    Section    I(A),    Carefirst    described    the    differences    between "clearance/availability" search reports and "investigative" search reports requested in anticipation of litigation.  All of the search reports that Carefirst has produced to date (including the January 10, 1996 report produced on August 17, 2004) are considered to be "clearance/availability" search reports requested by Carefirst's counsel in order to provide availability opinions regarding the mark FIRSTCARE.  The remaining search reports were requested by Carefirst's counsel in order to anticipate litigation in the form of infringement lawsuits against infringers of the CAREFIRST mark and name. Therefore, Carefirst has not waived its objection based on the attorney work product doctrine codified in Rule 26(b)(3).

## CONCLUSION

For all of the foregoing reasons, Carefirst respectfully requests that this Court deny First Care's Motion to Compel.

CAREFIRST OF MARYLAND, INC. d/b/a
CAREFIRST BLUECROSS BLUESHIELD,


By:__/s/ Steven M. Cowley_____
Steven M. Cowley, BBO #554534
Windy L. Rosebush, BBO #636962
EDWARDS & ANGELL, LLP
101 Federal Street
Boston, MA 02110(617) 439-4444


BOS_456873_1/WROSEBUSH

Barth X. deRosa
Christopher M. Collins *(pro hac admission being
requested by separate motion)*
STEVENS DAVIS MILLER MOSHER LLP
1615 L Street NW Suite 850
Washington, DC 20036
(202) 785-0100

Of Counsel to Plaintiff

Date: August 17, 2004

## CERTIFICATE OF SERVICE

I, Steven M. Cowley, hereby certify that a true copy of the above document was served upon the attorney of record for each party by filing electronically or by first class mail, postage pre-paid if counsel is not registered to receive electronic service on August 17, 2004.

_____/s/ Steven M. Cowley_____
Steven M. Cowley

BOS_456873_1/WROSEBUSH